Electronically Filed
Intermediate Court of Appeals
CAAP-13-0004948
23-FEB-2018
09:07 AM

NO. CAAP-13-0004948

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

STATE OF HAWAIʻI, Plaintiff-Appellee,
v.
MADORI RUMPUNGWORN, Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 13-1-0397)

MEMORANDUM OPINION
(By: Nakamura, Chief Judge, and Fujise and Chan, JJ.)

Plaintiff-Appellee State of Hawaiʻi (State) charged Defendant-Appellant Madori Rumpungworn (Rumpungworn) by complaint with Obstructing Government Operations, in violation of Hawaii Revised Statutes (HRS) § 710-1010(1)(a) (2014).[1] The charge stemmed from Rumpungworn's actions during an operation by employees of the City and County of Honolulu (City) to enforce the City's Stored Property Ordinance, Revised Ordinances of

_____

[1] HRS § 710-1010(1)(a) provides:

> (1) A person commits the offense of obstructing government operations if, by using or threatening to use violence, force, or physical interference or obstacle, the person intentionally obstructs, impairs, or hinders:
>
> > (a) The performance of a governmental function by a public servant acting under color of the public servant's official authority[.]

Honolulu (ROH) Chapter 29, Article 19.[2] After a jury trial, Rumpungworn was found guilty as charged. The Circuit Court of the First Circuit (Circuit Court)[3] sentenced Rumpungworn to thirty days of imprisonment.

On appeal, Rumpungworn contends that: (1) there was insufficient evidence to support her conviction; (2) questions posed by the deputy prosecuting attorney (DPA) to prospective jurors during jury selection which portrayed homeless people as dangerous and the DPA's use of a hypothetical which tracked the facts of the case were improper and constituted prosecutorial misconduct; (3) the Circuit Court erred in admitting evidence of Rumpungworn's past encounters with the State's witnesses; (4) the Circuit Court plainly erred by failing to *sua sponte* give a jury instruction on the choice-of-evil defense; and (5) the Circuit Court plainly erred in failing to *sua sponte* find HRS § 710-1010 unconstitutional as applied to her.

As explained in greater detail below, we conclude that questions by the DPA in jury selection improperly injected prejudicial stereotypes regarding and prejudice against the homeless into the proceedings and require that we vacate

---

[2] ROH § 29-19.3 (1990 & Supp. No. 20, 1-2012) provides:

(a)   No person shall store personal property on public property. All stored personal property may be impounded by the city. In the event personal property placed on public property interferes with the safe or orderly management of the premises or poses a threat to the health, safety, or welfare of the public, it may be impounded at any time by the city.

(b)   Personal property placed on public property shall be deemed to be stored personal property if it has not been removed from public property within twenty-four hours of service of the written notice required by Section 29-19.4, which requires such removal, and the city may cause the removal and impoundment of such stored personal property; provided that moving the personal property to another location on public property shall not be considered to be removing the personal property from public property; and provided further that this section shall not apply to personal property that, pursuant to statute, ordinance, permit, regulation, or other authorization by the city or state, is placed on property that is owned or controlled by the city.

[3] The Honorable Patrick W. Border presided.

Rumpungworn's conviction. We also conclude that there was sufficient evidence to support Rumpungworn's conviction and thus remand the case for a new trial. Given our analysis on these issues, we need not address the other arguments Rumpungworn raises on appeal.

BACKGROUND

I.

The Stored Property Ordinance prohibits the storage of personal property on public property, and it establishes procedures for providing 24-hour notice that stored personal property will be impounded if not removed, impoundment and storage of property that is not removed, and repossession of impounded property by its owner or disposal of such property. ROH Chapter 29, Article 19. Typically, enforcement of the Stored Property Ordinance at a particular site will occur over a two-day period. On the first day, City employees post removal notices on personal property stored on public property. Under the Stored Property Ordinance, these notices are required to describe the item to be removed and include statements that the item will be impounded if not removed within twenty-four hours and that the item will be sold or otherwise disposed of if it is not claimed within thirty days after impoundment. See ROH § 29-19.4 (1990 & Supp. No. 20, 1-2012). On the second day, City employees return to the site and impound or dispose of items that have not been removed as required. See ROH §§ 29-19.3, 29-19.5 (1990 & Supp. No. 20, 1-2012).

Rumpungworn was affiliated with the De-Occupy Honolulu movement. On the day of her arrest, Rumpungworn was living in a tent at Thomas Square Park. Rumpungworn's arrest occurred during a Stored Property Ordinance enforcement action at the park. City officials had taped-off the area surrounding tents, including Rumpungworn's tent, at Thomas Square Park. Police arrested Rumpungworn after she failed to leave the taped-off area after being asked multiple times to leave by a City official and the police. She was subsequently charged with Obstructing Government Operations, in violation of HRS § 710-1010(1)(a).

## II.

During jury selection, the DPA asked three potential jurors, prior to the exercise of peremptory challenges, whether they would allow their children or grandchildren to play on a jungle gym in a park if there were "tents right next to the jungle gym and there are homeless people camped out there." The three jurors, Juror D, Juror O, and Juror M, responded that they would allow their children or grandchildren to play on the jungle gym:

> [DPA]: [Q.] . . . . So, uh, [Juror D], you have two children; correct?
>
> A. Yes.
>
> Q. And you ever take them to the park?
>
> A. Yes.
>
> Q. Do you ever -- do they like to go on the jungle gym?
>
> A. Yes.
>
> Q. Let's say you -- you took them to a park. You see a jungle gym. There are tents right next to the jungle gym and there are homeless people camped out there. Would you still let your kids on the jungle gym?
>
> A. Yeah.
>
> Q. Yes. [Juror O] --
>
> A. Yeah.
>
> Q. -- you have five grandchildren?
>
> A. Yes.
>
> Q. If you had -- were in the same situation, would you let your grandchildren on there?
>
> A. Yeah. They're pretty big though.
>
> Q. They're pretty big. Oh, yeah. I'm sorry. You look very young to me that's why, so.
>
> A. They're (inaudible) years old.
>
> Q. Okay. [Juror M], what about you?
>
> A. Sure. Yes.

(Emphasis added; formatting altered).

4

After receiving these responses from the three jurors who would have permitted their children and grandchildren to play on a jungle gym in a park with homeless people nearby, the State proceeded to ask the panel whether there was anyone who would not let their children play on a jungle gym with homeless people nearby. Two prospective jurors, Juror A and Juror W, responded that they would not allow their children to play on a jungle gym in the park immediately next to tents occupied by homeless people:

> [DPA]: [Q.] . . . . Is there anyone who would not let their children -- uh, would not prefer to have them go on a jungle gym with homeless people, uh, or immediately around it?
>
> I'm sorry. Um, [Juror A], why is that?
>
> A. Hmm, partly because he's really young and he might just run off. So (inaudible) not to be in an area (inaudible).
>
> Q. Okay. So is it a safety concern for your child?
>
> A. Yes.
>
> Q. And if there were no tents around that jungle gym with no homeless people around there, would you let your children go on the jungle gym?
>
> A. Uh, partly, yeah. (Inaudible) I know I got him on the jungle gym (inaudible).
>
> Q. Okay. Okay. What if he was older, a little bit older? Jungle gym -- sorry. I don't have any kids. I have no point of reference.
>
> A. (Inaudible) after looking at that situation (inaudible).
>
> Q. Okay. Would you go on the jungle gym, Ms. (Inaudible)?
>
> A. Would I go on the jungle gym?
>
> Q Yes.
>
> A. Maybe.
>
> Q. [Juror W], uh, so you wouldn't let your daughter on the jungle gym if there were homeless people and tents mapped out immediately nearby the jungle gym?
>
> A. That's correct.
>
> Q. Okay. Why is that?

A. Just personal safety.

Q. Safety?

A. Yes.

Q. Okay. Can you please elaborate on that a little more?

A. Um, elaborate. Um, yeah. I mean she can wander off, you know, and I'd have to run after her. And -- yeah, I just would rather not (inaudible).

Q. Thank you for sharing.

A. Sure.

(Emphases added.)

When a new prospective juror, Juror V, was called to replace a juror excused after a peremptory challenge, the DPA questioned her about the DPA's hypothetical regarding homeless people living next to a park with a jungle gym, and the DPA received the following responses:

[DPA]: Q. So you have two kids. I'm going to ask you about the eleven-year-old. Uh, and can you -- do you remember my jungle gym question --

A. Yes.

Q. -- about the -- if there's a jungle gym? Well, do you take your child to the park?

A. Yes.

Q. And which park do you take your child to?

A. Well, (inaudible) Aina Haina (inaudible).

Q. Aina Haina, Waialae Iki. And if, um -- we're back to when -- would you take your child to the parks there? Would you take your child there if there were, um, several tents and homeless people in the park?

A. I think it would depend on where the tents are (inaudible).

Q. Uh-huh.

A. (Inaudible.)

Q. Why is that?

A. Um, because a lot of times it's dirty and I'd rather not (inaudible) the bathroom.

(Emphases added; format altered.)

Then, when another juror, Juror L, who was called to replace a peremptorily excused juror, stated that she worked at an elementary school, the DPA engaged her in the following exchange:

>     [DPA:] Q.  And so, uh, as -- what exactly is your position at the school?
>
>     A.  Uh, PCNC.
>
>     Q.  I'm sorry?
>
>     A.  PCNC.  (Inaudible) Communication Network Center.
>
>     Q.  PCNC.  And if -- how would you feel if, uh, homeless people came onto -- into the school during school hours?  What would you do?
>
>     A.  Um, right away we -- we do a security watch.  We contact all the safety team and then we would call the police (inaudible).
>
>     Q.  Thank you for sharing.

(Emphases added; format altered.)

The DPA did not ask the potential jurors whether their opinions on the homeless would prevent them from being fair and impartial in Rumpungworn's case.  Rumpungworn used her peremptory challenges to excuse Juror A and Juror W.  Juror V and Juror L were seated on the jury.  Rumpungworn did not object to any of the DPA's questions concerning the homeless.

III.

A.

City Housing Coordinator Trish Morikawa (Morikawa) testified that on the day Rumpungworn was arrested, Morikawa was present at Thomas Square Park to assist City workers in the enforcement of the Stored Property Ordinance.  According to Morikawa, the City had decided to tape-off the area surrounding personal property that was subject to the Stored Property Ordinance to permit City workers to perform their enforcement activities under the ordinance without interference.  Morikawa explained that based on past experience in enforcement actions at Thomas Square Park, De-Occupy Honolulu members who were opposed

to the enforcement actions would yell and swear at the enforcement crew, get in front of the crew, and would be very difficult to deal with. This made it very hard for the enforcement crew to do their jobs. So to protect the City workers and to avoid delays, the City decided to place "yellow construction tape" around the area in which the enforcement crew was working and to have "the [De-]Ocuupy Honolulu people to stay outside the tape so the workers could do their work."

Honolulu Police Department Sergeant Lawrence Santos (Sgt. Santos), who was present at Thomas Square Park "to keep the peace" on the day in question, testified that a tape barrier had been erected around the area where the City employees were working so that the City workers could "work freely and . . . safely"[4] and not be intermixed with the protesters and others occupying the park. Sgt. Santos explained that the use of construction tape to prevent access to the work area was done to create a "safer work environment for police, city employees, as well as the park users" and was part of the enforcement of the Stored Property Ordinance.

Morikawa testified that on the day in question, other people who were not part of the City enforcement crew went outside the taped-off area after the tape was erected, but that Rumpungworn refused to leave and stayed inside the taped-off area. Morikawa was informed that Rumpungworn was "bothering one of the workers." Morikawa went to investigate and saw Rumpungworn questioning a worker named Louis Chun (Chun), "asking him something to the effect of who are you? What are you doing? Why are you doing this? You know, what department do you work for? What -- you know, how do you feel about what you're doing?" Morikawa approached Rumpungworn and told Rumpungworn that she was

---

[4] Sgt. Santos testified that "during these park clean ups the people who live in the tents on the sidewalk tend to get upset, sometimes violent, sometimes -- always very loud, very vocal. Um, and the city workers just didn't feel safe even with the police presence there . . . with, um, people all about."

interfering with Chun's work and tried to get her "to stay away so the workers [could] do their work." Morikawa asked Rumpungworn to "get behind the tape," but Rumpungworn refused. Morikawa told Rumpungworn "more than once" that if she did not comply, she may be subject to arrest for obstructing governmental operations.

After refusing Morikawa's request to go outside the tape, Rumpungworn yelled to others who were outside the tape, trying to get them to come inside. Both Morikawa and Sgt. Santos asked Rumpungworn to leave the taped-off area. Rumpungworn began walking towards the tape perimeter, but did not leave the taped-off area, and instead moved to question other City enforcement personnel. According to Morikawa, after Rumpungworn began questioning the other workers, Sgt. Santos asked her repeatedly to leave the taped-off area and to "comply with his instructions." Rumpungworn did not comply.

When asked whether Rumpungworn physically interfered with the Stored Property Ordinance enforcement action, Morikawa stated that "[Rumpungworn] was making it difficult for [Chun]" because he "could not do his job while being confronted by Rumpungworn." Because Rumpungworn was "in front of" and "to the side of" Chun, he had to try to go around her. Furthermore, because City workers tried to avoid confrontation, the crew that usually worked with Chun did not come over with him, which impeded the actions necessary to impound the property. Morikawa acknowledged that Rumpungworn "did not touch, hit, or strike anyone," or use physical contact to prevent workers from "moving their hands to write notices." However, Morikawa stated that Rumpungworn's "physical presence was bothering" Chun and that while Rumpungworn was not physically touching him, she was "making it difficult for him to do his job."

Sgt. Santos testified that he confronted Rumpungworn after seeing that she was present in the taped-off area and was speaking to the City workers, but that Rumpungworn continued to talk to the workers. According to Sgt. Santos, he warned

Rumpungworn that she had to leave the taped-off area at least a dozen times, and other officers told her "[j]ust please leave." In addition to remaining in the taped-off area, Rumpungworn indicated her unwillingness to leave by saying, "[N]o, I'm not leaving" and by disregarding Sgt. Santos' instructions and visual cues to leave the area.

Prior to Rumpungworn's arrest, Sgt. Santos warned her that she would be arrested if she failed to leave the taped-off area, and he asked, "May I have your compliance?" multiple times. After Sgt. Santos advised Rumpungworn that he was giving her one "last warning to leave," Rumpungworn failed to leave the taped-off area. Sgt. Santos then instructed officers to arrest her.

B.

By stipulation, a video of the incident that was created by a member of De-Occupy Honolulu was admitted into evidence. This video was played for the jury in its entirety, and portions of the video were used by the prosecution and the defense in examining witnesses who testified at trial. The video shows yellow tape being used to block off an area of Thomas Square Park where several tents are located; Rumpungworn standing inside the taped-off area; Rumpungworn following and talking to Chun; Morikawa talking with Rumpungworn; Rumpungworn telling the person taking the video that "they're planning to arrest me if I don't get beyond the tape"; Sgt. Santos talking to Rumpungworn and asking, "Can I have your compliance?"; and Rumpungworn being arrested inside the taped-off area.

C.

Rumpungworn testified in her own defense at trial. Rumpungworn stated that she was 24 years old. According to Rumpungworn, at the time of the charged incident, she was a college student majoring in education and teaching and was "part of the Deoccupy Honolulu homeless encampment and protest." On the day in question, Rumpungworn was awakened by the sound of trucks, saw the officials gathering, and went to ask what they planned to do. Rumpungworn was within the area as it was being taped-off, and officials taped around her.

10

Rumpungworn testified that after the area was taped-off, she asked a police officer whether she could "hang around[.]" According to Rumpungworn, the officer nodded, which Rumpungworn understood to mean that she was permitted to remain within the taped-off area. Rumpungworn went to various City workers and asked whether they would be tagging property with removal notices or seizing property; she also asked questions about what they were writing on the notices. Rumpungworn stated that this was important because she had prior experience with City workers enforcing the Stored Property Ordinance in which property was not properly tagged and was then removed without following the requirements of the ordinance.

Rumpungworn acknowledged talking to Chun, but stated that she did not intend to obstruct him from doing his job and did not believe she was obstructing him. Morikawa approached Rumpungworn while she was talking to Chun, separated Rumpungworn from Chun, and asked Rumpungworn about her concerns with the ordinance and the removal notices. Morikawa requested that Rumpungworn maintain a distance of five feet from the workers conducting the operation, and Rumpungworn complied and stepped away from Chun.

### D.

The jury found Rumpungworn guilty as charged. The Circuit Court sentenced Rumpungworn to thirty days of imprisonment. The Circuit Court entered its Judgment on October 11, 2013, and this appeal followed.

### DISCUSSION

### I.

Rumpungworn contends that there was insufficient evidence to support her conviction because the State failed to prove that she intentionally: (1) used physical interference or obstacle;[5] or (2) obstructed, impaired, or hindered the work of the City employees. We disagree.

---

[5] The State conceded in closing argument that Rumpungworn did not use or threaten to use violence or force.

When viewed in the light most favorable to the State, the evidence showed that City officials taped-off the area where City workers were engaged in enforcement activities under the Stored Property Ordinance to protect the City workers and avoid delays by creating a safe area so the workers could perform their duties without interference. The decision to tape-off the area was based on past experience in prior enforcement actions at Thomas Square Park in which De-Occupy Honolulu members yelled and swore at the enforcement crew, got in front of the crew members, and made it very difficult for the enforcement crew to do their jobs. Rumpungworn was asked repeatedly by Morikawa and Sgt. Santos to leave the taped-off area so the City workers could perform their enforcement duties. Rumpungworn refused, despite being warned that she would be arrested if she failed to comply, and she even encouraged others to enter the taped-off area. Rumpungworn followed and stood next to Chun, a member of the City's enforcement crew, and questioned what he was doing. Morikawa indicated that Rumpungworn's physical presence was interfering with Chun and making it difficult for him to perform his work. Rumpungworn's physical presence also kept Chun's crew from accompanying him, which impeded Chun's ability to complete his enforcement activities. Even after Rumpungworn walked away from Chun, she did not leave the taped-off area, but questioned other members of the City's enforcement crew.

We conclude that there was substantial evidence to support the jury's finding that Rumpungworn intentionally used physical interference or obstacle to obstruct, impair, or hinder City employees, acting under the color of their official authority, in the performance of a governmental function.

Relying on her own testimony, Rumpungworn argues that her intent was not to obstruct, impair, or hinder the City workers, but to ensure that the workers were complying with the Stored Property Ordinance so that her property would be properly tagged and identified and could be reclaimed if it was removed. She also claims that she had been given permission to stay in the

12

taped-off area by an unidentified police officer. However, the assessment of the credibility of witnesses and the weight of the evidence is for the trier of fact. State v. Lee, 90 Hawaiʻi 130, 134, 976 P.2d 444, 448 (1999) ("It is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact." (internal quotation marks, citation, and brackets omitted)). The jury was free to reject Rumpungworn's testimony regarding her intent and base its decision on the other evidence presented.

II.

Rumpungworn contends that the DPA's questions to prospective jurors during jury selection regarding the homeless in public parks, which she claims were "designed to inflame the jurors passions and prejudices against the homeless rather than to see whether the jurors could be fair and impartial," constituted prosecutorial misconduct. We conclude that the DPA's questions were improper and warrant vacating Rumpungworn's conviction.

The purpose of questioning prospective jurors during jury selection, also known as jury voir dire, is to enable the parties to evaluate whether potential jurors are qualified and competent to serve and whether they can be fair and impartial. See State v. Simmons, 254 P.3d 97, 101 (Kan. 2011); State v. Bell, No. 03C019712CR00541, 1999 WL 436432, at *6 (Tenn. Crim. App. June 29, 1999). The proper scope of jury voir dire rests largely in the discretion of the trial court, and the parties are generally given latitude to engage in questioning that will serve to uncover biases, prejudgments, or prejudices. See Hawaiʻi Rules of Penal Procedure Rule 24(a) (2011); State v. Altergott, 57 Haw. 492, 499, 559 P.2d 728, 734 (1977); State v. Hayes, 855 N.W.2d 668, 678 (S.D. 2014).

However, the use of jury voir dire "to prejudice the jury for or against a particular party" is improper. Altergott, 57 Haw. at 499, 559 P.2d at 734. We acknowledge that it may be

13

difficult to distinguish between permissible questions that serve to uncover biases and prejudices and impermissible questions that serve to prejudice the jury for or against a party. It may also be difficult for counsel to frame questions that serve to uncover biases and prejudices that also do not have some potential for awakening existing prejudices that may be held by potential jurors. But here, based on our review of the record, we conclude that the DPA's questions crossed the line.

Rumpungworn was homeless, and whether the prospective jurors held a prejudice for or against the homeless was a legitimate subject of inquiry in jury voir dire. However, the manner in which the DPA framed his questions on this subject plainly fell on the side of impermissible questions that served to prejudice the jury against the defendant. This is because, as framed, the questions unnecessarily emphasized negative stereotypes associated with the homeless, namely, the perception that homeless people are dangerous to children and thus undesirable people. It would have been permissible for the DPA to frame his questions in a neutral fashion and to ask the prospective jurors whether Rumpungworn's status as homeless would affect their ability to be fair and impartial, or whether such status would cause the jurors to be sympathetic towards or prejudiced against Rumpungworn. Instead, the DPA framed his inquiry in terms of whether jurors would allow their children or grandchildren to play on a jungle gym in a park where homeless people were nearby, or what actions an elementary school would take if a homeless person came onto the school.

The reference to children in the DPA's hypothetical scenarios was gratuitous as there were no children associated with the Stored Property Ordinance enforcement activities at issue in this case. The use of children in the DPA's hypothetical scenarios also served to emphasize the negative stereotypes and animus certain people have for the homeless -- that they pose a danger and a safety concern, especially to

children, and their presence prevents the use by others of public parks. Moreover, by identifying jurors who would not let their children play in a park with homeless people nearby, and then asking those jurors to explain why, the DPA set the stage for remarks by jurors that painted the homeless in a negative light. Although the parties should be given latitude to uncover prejudices held by prospective jurors, we conclude that it is usually best to give the defendant the choice regarding whether questions emphasizing negative stereotypes or prejudices against a status held by the defendant should be used to determine whether prospective jurors are prejudiced against the defendant. See Rosales-Lopez v. United States, 451 U.S. 182, 191 (1981).[5]

The DPA's reason and motive for asking the questions regarding the homeless challenged by Rumpungworn on appeal are not entirely clear. This is because Rumpungworn did not object to the DPA's questions. Therefore, the DPA did not have a chance to explain his actions, and the Circuit Court was not asked to rule on the propriety of the questions or take curative action. However, based on our review of the record, we conclude that the DPA's questions were improper, as their effect was to gratuitously inject negative stereotypes of the homeless into the proceedings, through the use of hypotheticals raising scenarios irrelevant to the issues presented in the case, in a manner that prejudiced Rumpungworn. Indeed, the State acknowledges that the DPA's voir dire questions regarding the homeless were "largely irrelevant" because Rumpungworn's status as homeless or whether homeless persons had prevented children from playing in Thomas Square Park had no bearing on the issues in dispute.

Closing arguments "that rely on racial, religious, ethnic, political, economic, or other prejudices of the jurors"

---

[5] We suggest that where a prosecutor intends to ask questions designed to uncover whether potential jurors harbor a prejudice against a status held by the defendant, it may be prudent for the prosecutor to raise the issue with the trial court and defense counsel before proceeding.

are improper. See State v. Rogan, 91 Hawai'i 405, 413, 984 P.2d 1231, 1239 (1999) (quoting 1979 Commentary to ABA Prosecution Function Standard 3-5.8(c) (1979)). While the DPA's questions during jury voir dire were not arguments to the jury, and questions presented in jury selection generally have less impact on the jury's deliberations than closing arguments, the principle that prosecutors should not inject into the trial prejudices that may cause jurors to improperly stigmatize the defendant applies to jury selection. See id.; State v. Monday, 257 P.3d 551, 557 (Wash. 2011) ("Theories and arguments based on racial, ethnic and most other stereotypes are antithetical to and impermissible in a fair and impartial trial." (internal quotation marks, citation, and brackets omitted)).

We conclude that the DPA's questions to prospective jurors regarding the homeless were improper and constitutes plain error. While we have concluded that there was sufficient evidence to support Rumpungworn's conviction, the trial evidence was equivocal, and we cannot say that the DPA's improper questions did not contribute to Rumpungworn's conviction. We therefore vacate Rumpungworn's conviction[7] and remand the case for a new trial.[8]

---

[7] Because we vacate Rumpungworn's conviction based on the DPA's improper questions regarding the homeless, we need not address Rumpungworn's claim that the DPA improperly used a no parking hypothetical in jury voir dire to "condition the jurors to vote for conviction."

[8] We reject Rumpungworn's contention that the DPA's improper questions in jury voir dire regarding the homeless constituted misconduct that was so egregious that a new trial should be barred. As noted, Rumpungworn did not object to DPA's questions; the DPA did not have a chance to explain his reason and motive for asking the questions; and the DPA's questions occurred during the preliminary stages of trial in jury selection and did not involve questions or arguments during the evidentiary portion of trial or in closing argument. We conclude that the DPA's voir dire questions regarding the homeless do not warrant barring a retrial. We further conclude that any impropriety in the DPA's use of the no parking hypothetical in voir dire does not affect this conclusion. In this regard, we note that Rumpungworn modified the DPA's no parking hypothetical and asked questions about the modified no parking hypothetical that were similar to the questions asked by the DPA.

III.

In light of our decision to vacate Rumpungworn's conviction, we need not address her remaining points of error.[2]

CONCLUSION

We vacate the Circuit Court's Judgment, and we remand the case for a new trial.

DATED: Honolulu, Hawai'i, February 23, 2018.

On the briefs:

Jon N. Ikenaga
Deputy Public Defender
for Defendant-Appellant

Brian R. Vincent
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee

*Craig H. Nakamura*
Chief Judge

Associate Judge

Associate Judge

---

[2] With respect to Rumpungworn's contention that the Circuit Court plainly erred in failing to *sua sponte* find HRS § 710-1010 unconstitutional as applied to her, we note that Rumpungworn can raise a claim that HRS § 710-1010 is unconstitutional as applied to her on remand.